(66 App. Div. 59.)

CRAMER v. SLADE.

(Supreme Court, Appellate Division, Third Department. November 13, 1901.)

1. MASTER AND SERVANT—NEGLIGENCE OF EMPLOYER—EXPERT TESTIMONY.
   The questions whether timbers, well nailed together, would hold a lag screw in the crack between as well as if it were in solid timber, and whether the strain on the cables on a drum on the screw tended to lift it, as going to show whether inserting the screw between the timbers was an unsafe and careless mode, so as to be a breach of a master's duty to his employé, were properly the subject of expert testimony.

2. SAME—OPINION—EVIDENCE—ADMISSIBILITY.
   After giving a description of the machinery and the conditions involved, plaintiff asked a witness whether, in his opinion as a carpenter,

such insertion of the screw would be a reasonable method of fastening the drum cylinder to the support, which was answered, without giving any reasons therefor. *Held*, that it was error to allow such questions, as whether such method was reasonable, etc., was for the jury.

Appeal from trial term.

Action by Andrew Cramer against Emmet F. Slade. From a judgment for plaintiff and an order denying a new trial, defendant appeals. Reversed.

The plaintiff was at work for the defendant upon a platform about 7 feet wide, extending in front of an ice house some 200 feet in length. It was a part of the machinery used to fill such ice house, and was constructed in seven sections, the ends joined together by hinges; and at each of such junctures two wire cables, one at either side, led up to the roof, and over a drum about 14 inches in diameter, the axle of which rested in an iron box seated upon, and screwed with a lag screw in each end to, timbers fastened to the building. Upon one end of the drum was an iron rim of greater diameter than the drum itself, with cogs in its circumference which fitted into the thread of a worm fastened to timbers under the drum, and which could be turned either way as desired. By turning the worm one way, the intersection of its thread working upon the cogs on the rim of the drum caused it to turn and wind up the cables fastened to it. This caused the platform to also rise. The worm was worked by men turning the same, and when all seven of the drums were thus turned the whole platform was drawn up. By turning the other way, the platform could be lowered. The purpose of raising the platform was to unload ice therefrom into the house at different heights as the same became filled. The sections were about 30 feet long, and each could be separately raised or lowered, to a certain extent. Ice was taken onto the platform by steam power, at the north end, and slid along over each section to the point desired to unload therefrom. On the afternoon of January 24, 1899, the ice house had been filled nearly to the top, and the platform was raised some 25 feet from the ground. While the plaintiff was at work upon it, sliding along the ice, the ends of sections 5 and 6, where united, suddenly fell to the ground. The other ends and the adjacent sections thereto fell part way down. The plaintiff was injured by the fall, and brings this action against the defendant, who was the owner of the ice house, to recover therefor. After the platform had fallen, it was discovered that the iron box which held one end of the axle of the drum over which the cables on sections Nos. 5 and 6 led was at one end of it lifted up about 1½ inches from the timber upon which it was seated, and the lag-screw in that end had drawn up out of the timber about that distance. The cogs on the rim of that wheel were thrown out of mesh with the thread on the worm underneath. The other end of such box, and the lag screw in it, were still in their places. Neither had moved either upward from the timber or horizontally along it. The plaintiff claimed that it was the improper fastening of that end of the box to the timber that permitted it to raise up, and thereby throw the cogs of the wheel out of mesh with the worm, and cause the accident. The jury rendered a verdict for the plaintiff, and from the judgment entered thereon and the order denying a new trial this appeal is taken.

Argued before PARKER, P. J., and KELLOGG, EDWARDS, SMITH, and CHASE, JJ.

Edward W. Douglas and Lewis E. Carr, for appellant.
James G. Madigan, for respondent.

PARKER, P. J. The negligence to which the plaintiff ascribes his injury in this case, and which he charges against the defendant, is that a lag screw which was used to hold in its place the journal or box in which the axle of the drum rested, upon which were wound the

wire cables that supported a section of the platform upon which he was at work, was inserted into the crack between two timbers spiked together to form the support upon which the drum was erected. He claimed that the effect of inserting the screw into such crack, instead of into solid timber, was that the timbers, being green, shrunk as they dried out, and thus caused the crack to widen; that such widening of the crack drew the wood away from the thread of the screw, and thus lessened its hold upon the wood and weakened its resisting power, so that ultimately it would yield to a comparatively slight upward pull, and be drawn out of its place; that therefore it was insufficient to hold down to the timber the box which it was designed to hold in place; that, the box not being held firmly down to the timber, one end of it was pulled up and away from it by the strain of the cables on the drum, and that the axle of the drum, and so the drum itself, were also raised up with it about $1\frac{1}{2}$ inches; that this lifting of the drum caused the cogs of the wheel which formed its rim to lift up out of the thread of the worm which was used to turn such drum; and that, being so disconnected, there was nothing to keep the drum from revolving, or to restrain the cables from overhauling themselves, and the platform from dropping to the ground. This mode of inserting the screw into the wood, and holding the box in its place, was the only negligent act charged, and, as the plaintiff claims, it was owing to this screw drawing out and allowing the drum to lift upward that the platform fell. This was the "specific negligence" which the jury were instructed the plaintiff claimed against the defendant, and undoubtedly their verdict against him was based upon that particular act. The case is utterly without evidence as to any other defect in construction.

It was claimed by the defendant that the purpose of the lag screw was not to hold the box from raising up from the timber, but to keep it from slipping along upon the timber; that the strain upon the cables, caused by the weight of the platform, had no tendency whatever to lift the drum or its axle from off the timber, and that there was, in fact, no strain or force applied to the box or the lag screw that tended to pull it up from or out of the timber; that, therefore, it was of no particular importance whether the screw threads were capable of resisting an upward pull or not; and that it was plain that it answered its full purpose to hold the box from slipping horizontally along the timber on which it rested, because it did not so slip, but the screw in the other end of the box, and the box itself at that end, was still in place, even after the platform fell. For this reason he argues that it was not owing to the lag screw pulling out that the box was raised up and the drum disconnected from the worm, but that the disconnection occurred from some cause unknown to any one, and the screw was pulled out and the box lifted by the force of the falling platform.

Evidently, the ultimate question which the jury were to determine was whether the insertion of the lag screw into the crack between the timbers was an unsafe and careless mode of fastening the box to the timber, and therefore a breach of the defendant's duty to the plaintiff. But the answer to this question depended upon their con-

·clusion as to the existence of several facts claimed by the plaintiff ·and denied by the defendant: First. With the timbers well nailed together, ·would the lag screw hold as well and as long in the crack ·as if in the solid timber? It may be assumed that this is a question properly the subject of expert testimony. Secondly. With the cables fastened to the drum in the manner shown, did the strain upon them ·tend to lift the box or the screw in question up from the timber, or was it entirely lateral, and was there no force exerted upon the drum ·or box which tended to lift them from the timber? Clearly, this was the subject of expert testimony.

If the screw would hold as firmly in the crack as in solid wood, then it was not an unsafe method to insert it that way. If there was no strain in the construction of the system tending to lift the box or draw it up from the timber, then it cannot be supposed that it was negligent not to guard against such a strain; and it cannot be supposed that the steady and constant strain on the cables, as re-·quired in their usual and ordinary work, overcame the resisting strength of the lag screw, or that its yielding and drawing out caused the fall of the platform. If, however, the timber was liable to shrink, and thereby loosen the hold of the screw, and if there was a strain from the cables, or from any other source, that tended to draw up the box, and thus pull on the lag screw, it might well be that it was the defect in that screw that caused the accident.

It is a very serious question whether the decided weight of the ·evidence is not with the defendant on these questions. The witness ·Gifford, who invented the machinery in question, testified that there was no strain or ·force tending to lift up the box from the timber to which the lag screw held it; that the strain was entirely lateral or downward; and that if the lag screw was taken out it would not lift the box up from off the timber. Another witness—an engineer—testified that the strain upon the drum was entirely lateral, in the di-·rection towards which the cables led, and that no force tended to lift the box from off its seat. The plaintiff upon these two questions gave no evidence, except as follows: After putting to the witness Walsh, who was a carpenter and builder, a hypothetical question which gave a description of the machinery in question and the con-ditions involved, he asked this question: "In your opinion as a ·carpenter and builder, would that be a reasonable, safe, and proper method of fastening that drum cylinder to the support?" Under the ·defendant's objection and exception, the answer was, "I don't think it would." Then the further question was put, "In your opinion, Mr. Walsh, would a cylinder and drum required to support the weight that I have mentioned, and fastened as described in the last question, be liable to pull out with the weight so put upon it, fastened in this way?" Under objection and exception, the answer was, "I think it would; yes, sir." It is to be noticed that his attention is nowhere particularly called to the lag screw. Upon the whole con-·struction as given in the hypothetical question, he thinks the drum would be liable to pull out, but just what he considers the defect in the structure he does not state. On his cross-examination he states that the strain would be horizontal, in a line with the cables, and his

whole evidence is far from giving intelligible answers to the two questions above suggested. From the construction of the machinery, as given by the evidence, I am myself unable to see how any lifting force was applied to the drum, or what lifting strain there was upon that lag screw, caused by the ordinary use for which the structure was designed, and I am strongly of the opinion that the weight of evidence is that there was none; and, if there was none, it is difficult to see how the cause of the fall of the platform can be ascribed to the lag screw being insufficient to hold it up.

But it is not necessary to decide this appeal entirely upon this question of fact, for the exception taken to the question first above stated, as put to the witness Walsh, requires a reversal of this judgment. The question put was whether that method of fastening the drum cylinder to the support was a reasonably safe and proper one. That was the precise question which the jury must answer, and upon which their verdict was to rest; and, as suggested above, it depended to a large extent upon certain facts which were the subject of expert evidence, but which could be easily placed before the jury by the evidence of experts. When such is the situation, I understand the rule to be thoroughly settled that the experts may be inquired of as to such facts, but that, having instructed the jury with regard to them, it is the province of the jury alone to apply those facts to the question at issue. Dougherty v. Milliken, 163 N. Y. 527, 57 N. E. 757; Harley v. Manufacturing Co., 142 N. Y. 31, 37, 38, 36 N. E. 813; Ferguson v. Hubbell, 97 N. Y. 507, 49 Am. Rep. 544.

Clearly, it was possible to have asked Walsh directly for his opinion as to the effect of putting a lag screw into the crack between two timbers, and also as to whether there was any upward strain or force tending to lift the box and drum up from the timber on which it was fastened, and he could have given the jury all the information which he possessed upon those subjects. But, within the rule above cited, that was the extent to which his opinion could be taken. Instead of limiting the question to those matters, however, it goes to the full extent of taking his judgment as to whether the mode of fastening used by the defendant was a reasonable, safe, and proper one. Thus, the jury were allowed to lean upon his judgment as to what was reasonable, as well as safe and proper, instead of forming one of their own. Moreover, as suggested above, the jury were not informed by his answer just what his reasons for that judgment were. Why did he consider it unsafe? Was it owing to a defective lag screw, or did he possibly consider that something more than the intersection of the cogs in the rim, with the thread of the worm, should have been used to keep the drum from turning when not in use? Or did he, perchance, find some other criticism upon which he based his conclusion? Possibly, his opinion, which the jury have adopted, was based upon some fact not disclosed, and entirely different from the one for which the defendant is charged with neglect.

It is urged by the plaintiff that the rule laid down in the cases above cited has been changed by the recent case of Finn v. Cassidy, 165 N. Y. 584, 59 N. E. 311, and that within its rule the question before us was properly allowed. I do not so understand that case. I

can discover no purpose therein of changing or modifying such rule. In the latter case, it was thought by the court that it required an expert's knowledge to answer the question whether the defendant had provided a safe place for the plaintiff to work in; that the situation in the bottom of the pit was so complicated that what was necessary to make it safe could not be fully explained to a jury, and hence the opinion of the expert was allowed upon that subject. It was one of the cases coming under the second class referred to in Dougherty v. Milliken. The case at bar is very plainly one included within the first class therein mentioned, and the rule there given is clearly applicable to it.

I conclude, therefore, that it was error to allow the question, and that the exception was well taken. For these reasons, the judgment and order appealed from must be reversed, and new trial granted, with costs to appellant to abide the event.

EDWARDS, J., concurs. SMITH, KELLOGG, and CHASE, JJ., concur in result.